# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs September 3, 2014

## STATE OF TENNESSEE v. ROBERT ECHOLS

**Appeal from the Criminal Court for Shelby County**
**No. 11-00459    James C. Beasley, Jr., Judge**

---

**No. W2013-02044-CCA-R3-CD  - Filed November 26, 2014**

---

A Shelby County jury convicted the Defendant, Robert Echols, of aggravated robbery, aggravated burglary, and theft of property valued over $1,000. The trial court merged the theft of property conviction and the aggravated robbery conviction, and it ordered the Defendant to serve an effective sentence of twenty years in the Tennessee Department of Correction. On appeal, the Defendant contends that: (1) the admission of the victim's preliminary hearing testimony violated his constitutional right to confront and cross-examine witnesses against him; (2) the trial court erred when it admitted into evidence an unsigned statement of the Defendant; (3) the evidence is insufficient to sustain his convictions; and (4) the trial court erred when it sentenced him. After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Brent A. Heilig, Memphis, Tennessee (on appeal) and Charles Waldman, Memphis, Tennessee (at trial) for the appellant, Robert Echols.

Herbert H. Slatery, III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts
#### A.  Trial

This case arises from a robbery that occurred at the home of the victim, Daniel Porter. In relation to this robbery, the Defendant was indicted for aggravated robbery, aggravated burglary, and theft of property valued over $1,000. At the Defendant's trial on these charges, the following evidence was presented: Officer Derek Pittman, with the Memphis Police Department, testified that he responded to a home invasion robbery call on September 11, 2010, at a home on Kendale Street. At the time he received the call, he was not far from that location. Officer Pittman said that, when he arrived at the home, he knocked on the door, and it took "a while" for someone to come to the door. When the door did open, the officer saw the victim, who was not wearing a shirt and appeared "very shaken up." The victim had trouble telling the officer what had occurred.

After speaking with the victim in an attempt to discern what had occurred, Officer Pittman learned that the victim was in the back of his house walking through the kitchen when "someone" approached him with a knife and put it to his neck. The victim said the robber had "tied him up" and covered him with a blanket. The officer saw several welts around the victim's wrists and a string around his neck. Officer Pittman recalled that the victim said that a camera, a laptop, and a car were taken during the invasion. After learning that a car had been stolen, Officer Pittman put out a broadcast to other officers in the area asking them to look for the vehicle, which he described by appearance and license tag number.

Officer Pittman testified that the rooms in the victim's home appeared "ransacked." The officer found the blanket that the victim said he was covered with, and he described it as white with flowers. When he walked outside the home, Officer Pittman saw the driver's side mirror of the stolen vehicle still lying in the driveway. He assumed that the missing vehicle would be missing the driver's side mirror.

Officer Pittman spoke with one of the victim's neighbors. One neighbor told him that she observed a vehicle backing out of the driveway and then sped eastbound on Kendall Street at a "high rate of speed."

After leaving the home, Officer Pittman searched around the home for the robbery suspect and also for the knife, which the victim had described as a "steak knife." He found neither.

During cross-examination, Officer Pittman testified that he never saw the Defendant on the night of the robbery or on any other night. He said that the call about the robbery came at around 9:00 or 10:00 that evening. He said that his "partner" officer, who drove in a different patrol car, also responded to the victim's residence. Officer Pittman said he did

2

not observe signs of forced entry at the front of the home. The officer said the victim told him that the entire robbery lasted between thirty and forty-five minutes. Officer Pittman said he only spoke with one of the victim's neighbors, and she told him that she knew that it was not the victim driving his car away rapidly because the victim was "elderly."

Officer Pittman said that he did not call an ambulance for the victim because the victim said that he was okay. The officer did call the crime scene investigators who arrived and processed the scene.

Officer Pittman said that the victim told him that, as he walked from the laundry room to the kitchen, he was approached by the robber from behind. The robber put the knife to his neck at that point. Officer Pittman said he did not notice the odor of alcohol on the victim, and he was unaware whether the victim was on his way to take a shower. The officer said the victim told him that he was tied up and sitting in a chair but not that he was tied to the chair. The officer also recalled that the victim told him that, at one point during the robbery, he and the robber held hands and prayed.

Officer Pittman did not recall the victim's description of the robber, other than that the victim told him that the robber was African-American and six feet tall. Reviewing his report, Officer Pitman recalled that the victim also said the robber had "a loud voice," was "dirty," had "straight teeth and . . . was very angry." The victim said that he did not know the robber and had never seen him before. The victim told Officer Pittman that he had a sheet over his head during the invasion.

During redirect examination, Officer Pittman testified that the victim indicated that the robber was wearing a pair of blue jeans but no shirt.

Christopher Sanders, an officer with the Memphis Police Department, testified that he responded to process the crime scene. Officer Sanders took pictures and tagged evidence. He identified those pictures for the jury. Officer Sanders identified a multi-colored blanket or sheet that he retrieved as evidence because he was informed that the victim was restrained with that blanket. The officer said that he did not recover a knife at the crime scene. During cross-examination, Officer Sanders testified that he reported to the victim's address at 11:26 p.m. He said that he did not attempt to take fingerprints from the crime scene. He said that he would have only taken fingerprints if he had been instructed to so do. He said that no one instructed him to dust for fingerprints around any of the windows.

Earlice Charles testified that he knew the victim from their involvement together in the community. Mr. Charles recalled that the victim had previously been a priest. A month after the robbery, the victim began acting "differently" and that the victim had died in

January. During cross-examination, Mr. Charles testified that the victim used eye glasses to drive, presumably because he had difficulty seeing at a distance.

Kirby May, with the Shelby County District Attorney's Office, testified that he was present at the Defendant's preliminary hearing. He said that the victim was also present, as well as Sergeant Pruitt, and a judge. The Defendant, who was represented by counsel, also attended the hearing. A recording of the victim's testimony from the preliminary hearing was played for the jury.

During the preliminary hearing, the victim testified that he was seventy-nine years old and had retired from a State job, where he worked as the Director of Human Rights. He said he was also a retired Roman Catholic priest. On September 11, 2010, the victim was living at 1583 Kendall Avenue. He said that he was "robbed" on that date. He recalled that he was preparing to take a shower and was naked. He went to get a drink of water when a man grabbed him and told him to get on his knees. The man told him to crawl to his bedroom. The victim said that the man, who was unarmed, made him sit down in a chair and put a sheet over the victim's head. The victim said he only saw the robber briefly but said he was an African-American man who was close to six feet tall. The victim recalled that the man did not have on a shirt and was wearing "blue-ish" jeans.

The victim testified at the hearing that, after the man put the sheet over the victim's head, the man started going through the victim's belongings. The man took two wallets, two cell phones, a digital Sony camera that cost $700, and some other items. The victim said he saw the man take these items because he raised the sheet up. The victim said that the man "eventually" found a steak knife in the victim's bedroom and threatened to kill the victim if he raised the sheet again. The victim explained that he kept the knife in his bedroom for use as a letter opener.

The victim said that the man took the items out of the bedroom and then forced the victim to go to the front room. Still holding the weapon, the man told the victim to lie down and keep quiet. While the victim lay on his back on the floor, the man carried out items and put them into the victim's car. The man then drove the victim's car away from the home, leaving the victim inside. The victim noted that the man tore off the side view mirror as he was leaving.

The victim said that he called 911 and spoke with police when they arrived. He provided them with a description of the man and the items that he believed the man had stolen. The victim identified the Defendant in the courtroom as the man who had robbed him that day.

The victim said that he did not give the Defendant permission to come into his home, and he did not give him permission to take any of these items.

During cross-examination, the victim said that he wore glasses but that he was not wearing his glasses at the time of this robbery. He was unsure what his vision was without his glasses. The victim said that he first knew something was amiss that evening when he noticed that his front door was open because he did not regularly leave his front door open. The victim said he was under the sheet for approximately ten minutes. He recalled feeling "so scared" and said he was "praying constantly out loud."

After the recording was played, Assistant District Attorney May testified that the victim had positively identified the Defendant as the man who had robbed him during the preliminary hearing. The district attorney stated that the victim had died of natural causes.

During cross-examination, District Attorney May testified that his aim at the preliminary hearing was to prove that the State had probable cause to bind the case over for trial. That was the determination made by the judge. He said that this hearing was held in a busy courtroom with many people present.

Officer Rex Shipley, with the Memphis Police Department, testified that he participated in the investigation of this robbery. He said that at the beginning of his shift he responded to the victim's address where other officers were already present. He learned that a car, among other things, had been stolen, and he looked for the vehicle during his shift that evening. The following evening, Officer Shipley and his partner, who drove separate vehicles, again attempted to find the stolen vehicle. While Officer Shipley was on patrol that evening, a vehicle similar to the stolen vehicle approached a stop sign while Officer Shipley was pulling out of an alley. Officer Shipley said he "tried to act oblivious" and he pulled across the street. The vehicle went through the stop sign. Officer Shipley made a U-turn, came back to the vehicle, attempted to match the description, and began following the vehicle. He did not initially activate his blue lights because he wanted to first match the vehicle license tag number with the number of the stolen vehicle.

Officer Shipley testified that, as he was attempting to get closer to the vehicle, the driver began accelerating away from the officer. Officer Shipley said that the driving was "reckless," so the officer activated his blue lights and initiated a traffic stop. The driver of the vehicle made an abrupt turn down a dead end street, and then he "slammed his brakes on [and] opened the door." The driver, whom the officer identified as the Defendant, exited the vehicle and began running away. Officer Shipley estimated that he was twenty feet from the Defendant when he exited the vehicle. The Defendant, whom he saw for approximately three seconds, was wearing a blue t-shirt and jeans. He thought the Defendant had longer hair that

was in "cornrows" and pulled back. He attempted to chase the Defendant, but he lost track of him. He provided police dispatch with a description of the Defendant.

Officer Shipley testified that he saw a man standing outside of a house and he stopped to speak with him. Based upon this interaction, he stopped his pursuit of the Defendant until he could get a perimeter set up with other cars. He requested a K-9 officer to attempt to locate the Defendant. Officer Shipley said that, at this point, he heard some dogs barking, which he noted might have been a part of the "foot chase." He also heard a noise that sounded like a bin of metal cans being thrown onto the ground. Officer Shipley noted that the noise came from outside 999 Rayner Street. After the perimeter was established and the dog failed to make a scent, officers surrounded 999 Rayner Street. Officer Shipley noticed that there were several bins containing metal that had been overturned. He then noted that there was a screen from a window of the home that had been pulled off and the window was wide open. He said, however, that because the dog had been unable to track a scent, the officers waited.

Officer Shipley said he consulted with his lieutenant, who had arrived at the scene. He then knocked on the door of the home and spoke with the home owner, who refused him consent to search the home. Officer Shipley said he then went back to the vehicle and towed it to the police station. The vehicle's license tag number matched the license tag number of the stolen vehicle, and it had a sticker consistent with the sticker on description of the victim's vehicle. Officer Shipley said that he observed the driver of the vehicle and he identified the Defendant as the driver of that vehicle.

Officer Shipley described the foot chase with the man he identified as the Defendant. He said that he caught a three-second glimpse of the Defendant before losing sight of him. He recalled that the Defendant was "broad shoulder[ed]" and had "dreads" that had a "bead or something at the end to keep them down."

Charles Cathey, an officer with the Memphis Police Department who worked in the Crime Scene Unit, testified that he participated in this investigation. He said that he processed the victim's stolen car, a gray Chevrolet. He took photographs of the vehicle and attempted to dust it for fingerprints. He said he was unable to obtain any fingerprints, noting that there was an "oily substance" on the car. This substance prevented him from being able to collect any fingerprints. Officer Cathey identified photographs he took of the vehicle that showed the vehicle's license tag and a clergy sticker on the back of the vehicle.

Timothy Reynolds, an officer with the Memphis Police Department, testified that he participated in this investigation. He said that he received information that an individual, the Defendant, was a "person of interest" related to this robbery. He said that he learned the

Defendant might be at 999 Rayner Street. On September 14, 2010, Officer Reynolds went to the Rayner address, knocked on the door. The Defendant answered the door, and Officer Reynolds informed the Defendant that he was there to arrest the Defendant and needed to bring him to the police station. The Defendant, at that time, was wearing a blue shirt and black jeans. He took a picture of the Defendant's jeans because the Defendant had a string like material around his pants that was tied in an unusual manner. He forwarded this picture to the robbery office.

Vernon Van Buren, a sergeant with the Memphis Police Department assigned to the robbery office, testified that he participated in the investigation of this robbery. He said that Sergeant Boyce was the initial investigator in the case but, after the Defendant was arrested as a suspect, Sergeant Boyce asked Sergeant Van Buren to interview the Defendant. Sergeant Van Buren said that he read the Defendant his "Advice of Rights" and then took his statement. Sergeant Van Buren read the Defendant's statement into evidence as follows:

> Did you participate in the robbery of Daniel Porter which occurred at 1583 Kendall on Saturday, September 11th, 2010 at approximately 5:50 p.m?
> Yes. I guess so. If I took his money, yeah.
> Did anyone else participate in this robbery with you? If so, name them.
> No, sir.
> Were you armed with a weapon? If so, describe it.
> No, sir.
> . . . . Were you armed with . . . any type of instrument?
> . . . [N]o, sir.
> Were you wearing any type of gloves?
> I wasn't wearing anything.
> When you first arrived at the house, were there any lights on?
> No, sir. I thought that no one lived there because there was an old odor coming from the house. When I entered the house, [it] looked ransack[ed] with things everywhere. It looked abandoned.
> How did you enter the house?
> I went through the front door. It was open. I guess he thought he had locked it but it was open.
> After entering the house, where did you encounter [the victim]?
> I guess it was in the hallway.
> Is that in the rear or the front of the house?
> I started going towards the back just looking. It was near a bedroom.
> After you encountered [the victim], what happened.
> I just told him to get down on the floor. He was an old man. I wasn't going to hurt him. I didn't do anything to him. I just touched him and helped

him down on the floor because he said his back was hurting.

After laying [the victim] on the floor, what did you do next?

I found a sheet to put over his head so he wouldn't be able to continue seeing me.

What were you wearing that night?

I don't remember because I had been up about seven or eight days without eating or drinking anything. I had just been using drugs and going from here to there doing nothing.

On the night of the robbery how was your hair styled.

It was platted up.

Why did you take your hair down?

I took it down because it was itching. I didn't take it down for no other reason. I was out on the street and could have been taking it down.

What did you do to hold your pants up?

I had a string in them the other day.

What did you take in this robbery?

[I] took a camera, a video camera, wallet, $10 and this thing sort of looked like an amp. It was in a package. It was an old fashioned video camera. The keys to the car were on the floor. He had taken them out of his pocket and put them on the floor.

Upon leaving the house, how did you leave?

I took his car which I think was an Impala. I don't even know what color it was.

What did you [do] with the property that you took?

I sold it around the neighborhood.

Was a vehicle used during this robbery? If so, describe the vehicle.

No. I was walking . . . looking through the garage of the empty house next to his.

Describe in detail the events prior to, during and after this robbery?

I was walking though the neighborhood and came upon this empty house next to his. I was walking past and seen the window and I smelled what smelled like an old house, I started yelling through the window to see if anybody was there cause it looked abandoned, like an old house. When I didn't get a response, I jumped over the balcony and went through the front door. After I went in, I got to looking around and walked to the back room. That's when I heard him coming through the house. So I just picked up a sheet from the floor. I was going to cover my face at first so I could get on past him. Remember I told you the house was junky.

Afer I picked up the sheet, I told him to lay down. Lay down. Lay down. He told me his back was hurting and I said let me help you. He said

8

something to the nature as if he was hurting or about to have a heart attack and that's when I laid him down. After that I just took time. We did some talking and asked him for some money to get some drugs. He said he didn't have any money. I took the wallet from the pants that were laying on the bed and took the $10 from the wallet.

Then I asked him for some more money and we were talking and he started praying for us and telling me that he was a pastor. I stayed for a little while and talked to him while looking around for things to take that I could get money off of. I then picked up the other stuff, (camera video, amp and keys). When I was getting ready to leave, I left out the door and got on in the car and left.

Why did you participate in this robbery?

I had been up eight days and I'm on crack. I was just looking for a few things to get a couple of dollars at the time.

Is there anything else you would like to add to this statement?

I'm very sorry. I'm remorseful for what I did. I just wasn't thinking because I'm on these drugs and I've been thinking of a way that I could make it right, right now.

Sergeant Van Buren said he read this statement back to the Defendant, who verified its accuracy. The Defendant then refused to sign the statement.

During cross-examination, Sergeant Van Buren testified that he had never met the Defendant before the interview. He said that Sergeant Pruitt asked the Defendant the questions, and Sergeant Van Buren compiled the report. Sergeant Van Buren agreed that no one asked the Defendant if he had been to the home before or whether he knew the victim. He said also that the Defendant never mentioned either of these two things.

Andre Pruitt, a sergeant with the Memphis Police Department, testified that he participated in this investigation. He said that, after the Defendant had been arrested, he was tasked with interviewing the Defendant. He said that he and Sergeant Van Buren reviewed the Defendant's rights with him and discussed whether the Defendant wished to give a statement. Sergeant Pruitt said that, at the conclusion of the statement, the Defendant read and verified the accuracy of his statement. When asked if he would like to add anything, the Defendant did not mention whether he had been to the home before. Sergeant Pruitt said that the Defendant refused to sign the statement.

During cross-examination, Sergeant Pruitt denied that the Defendant refused to sign the statement because it did not say that he had been to the home before. Sergeant Pruitt said that the interview with the Defendant was neither audio or video-recorded.

9

For the defense, Korneisha Echols, the Defendant's niece, testified that she dropped the Defendant off several times on Kendall Avenue where the victim's house was located. She remembered that, one time in May, the Defendant had a bag with him. Ms. Echols recalled that this was "after my baby's birthday party." She "pulled down on [the Defendant] and asked him what he had in the bag." The Defendant told her that he had something to sell. Ms. Echols described the bag as a "big . . . clear plastic bag" that had some clothes in it. Ms. Echols identified the victim's house and said that she saw someone open the door to that house when she dropped off the Defendant. Ms. Echols said she took the Defendant to the same address approximately two times in June 2010. Ms. Echols said that the Defendant had been addicted to crack cocaine for as long as she could remember.

During cross-examination, Ms. Echols said that her aunt, the Defendant's sister, lived at 999 Rayner Street. Ms. Echols reiterated that, when she took the Defendant to the victim's house, a man opened the door and let the Defendant into the home.

Based upon this evidence, the jury convicted the Defendant of aggravated robbery, aggravated burglary, and theft of property valued over $1,000.

## B. Sentencing

At the sentencing hearing, the State informed the trial court that the presentence report indicated that the Defendant had six prior felony convictions. The State noted that one of these felony offenses was a B felony, one was a C felony, two were D felonies, and two were E felonies. Therefore, the State posited, the Defendant was a Range II offender for his current aggravated robbery conviction, a Range III offender for his aggravated burglary conviction, and a career offender for his theft conviction. The State argued that, pursuant to statute, because the Defendant had a previous conviction for aggravated robbery, his sentence for his current aggravated robbery conviction must be served at 100%. The State asked that the trial court apply two enhancement factors: (1) that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range; and (5) that the Defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense. T.C.A. §40-35-114 (1) and (5) (2014). The State asked that the Defendant be sentenced consecutively because he was a "dangerous offender." The State noted that he had a prior conviction for aggravated robbery and for rape. The State asked for a total effective sentence of forty-seven years.

The Defendant's attorney asked that the trial court consider in mitigation that the Defendant was a drug addict, that he had been a crack user for an extended period of time, and that this crime occurred when he was under the influence of crack. He further noted that the Defendant never had the opportunity to cross-examine the victim about whether the

10

victim invited him into the home, about whether the two knew each other, or about whether they had engaged in any kind of interaction prior to this event. He stated that it was not clear whether the knife involved in the robbery was, in fact, a letter opener that did not pose a threat to the safety and well being of the victim. The Defendant's attorney noted that there were many facts that were not known because the victim was unavailable at trial.

The Defendant's attorney informed the trial court that the Defendant's prior aggravated robbery had occurred when the Defendant was twenty-one years old and the Defendant was, at the time of the hearing, forty-five years old. The Defendant's sexual battery conviction also occurred when the Defendant was much younger. He said that his most recent offenses were driving-related.

The Defendant testified on his own behalf. He noted that he had not signed the statement, and he said he had not done so because the statement was untrue. He said he only told the police what they wanted to hear so that he could receive a meal. The Defendant explained that he had never been convicted of rape and that his sexual battery conviction involved "groping a gal" when he was eighteen years old. He clarified that he never had sex with the girl in that case. The Defendant said the girl's mother "put the charge on [him]" and that he had successfully completed three years of probation. The Defendant explained his aggravated robbery conviction saying that he came into a woman's building, picked up a pocketbook and ran out with it. The woman chased behind the Defendant and fell down. Based upon these facts, the judge ruled that it was an aggravated robbery.

The Defendant said that he had never hurt anyone in any crime that he had committed. He admitted that he had stolen items but explained that it was in an attempt to obtain narcotics. The Defendant did not "totally deny being involved in [this] crime." He said, however, that the way this crime happened had been fabricated by the police.

After hearing the testimony and arguments of Counsel, the trial court sentenced the Defendant. The trial court considered the purposes of sentencing and the sentencing considerations. It then found:

> I've considered those factors and the pre-sentence report and the statistics provided by the administrative office of the court and in reviewing the pre-sentence report it appears to the Court that [the Defendant] would qualify as a Range Two multiple offender for the offense of aggravated robbery and as a Range Three persistent offender for the offense of aggravated burglary.
>
> It also appears to me that the theft of property is a lesser-included

offense of the aggravated robbery. It is the same offense for the same property, therefore, the Court would find that Count Three should be merged into Count One for the conviction and I will merge the theft into the aggravated robbery. So I will find that – that should just be one sentence.

The trial court found that enhancement factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range, applied. It said:

> I think the proof is and it is obvious from the pre-sentence report that he does have an extensive record that goes back to when he was eighteen years old, back in 1987. So some twenty-five years over that time period he has been arrested for various felonies and theft related charges, some driving charges, misdemeanors, felonies, some involving violence and some involving just theft.

> So I am going to find that[.] I'm going to put a great deal of emphasis on the fact that he has an extensive background [of] criminal convictions and criminal behavior in addition to that . . . necessary for his range of punishment.

The trial court found that the evidence presented was sufficient to prove that the Defendant possessed a deadly weapon, in the form of a knife, during the commission of the offense. The trial court noted that this was an element of aggravated robbery and, therefore, was not an applicable enhancement factor. The trial court also declined to apply the exceptional cruelty enhancement factor. It noted that the Defendant's treatment of the victim was "offensive and . . . cruel" but it did not rise to the legal level of "exceptional cruelty." The trial court found no mitigating factors applicable.

The trial court then found:

> The Court is of the opinion that the appropriate punishment for the aggravated burglary would be a sentence of twelve years as a Range Three persistent offender and the Court will so order.

> As to the offense of aggravated robbery found in Count One, the Court finds that [the Defendant] [is] a Range Two multiple offender. However, this sentence is to be served at the rate of one-hundred percent. The Court again finds that he has an extensive history of criminal convictions and behavior in addition to that necessary for this range and I am going to put a great deal of emphasis on that.

12

After making several considerations, the trial court sentenced the Defendant to twenty years for the offense of aggravated robbery. The trial court declined to order consecutive sentencing, and it sentenced the Defendant to concurrent sentences, for a total effective sentence of twenty years to be served at 100%.

## II. Analysis

On appeal, the Defendant contends that: (1) the admission of the victim's preliminary hearing testimony violated his constitutional right to confront and cross-examine witnesses against him; (2) trial court erred when it admitted into evidence an unsigned statement of the Defendant; (3) the evidence is insufficient to sustain his convictions; and (4) the trial court erred when it sentenced him. The State counters first that the Defendant waived appellate review by failing to timely file a motion for new trial or notice of appeal. It then asserts that the trial court did not commit any evidentiary errors, that the evidence is sufficient to sustain the Defendant's convictions, and that the trial court properly sentenced the Defendant.

### A. Waiver

The State contends that the Defendant's appeal should be dismissed as untimely because he filed his motion for a new trial and notice of appeal more than thirty days after the final judgment. Following the Defendant's trial, the trial court held a sentencing hearing on June 27, 2013, and entered judgments of conviction that day. On August 15, 2013, the Defendant filed a motion for new trial. On the same day, August 15, 2013, the trial court held a hearing on the Defendant's motion for new trial. At the hearing, neither party raised the waiver issue, and the trial court ruled on the issues on their merits. The Defendant filed his notice of appeal the same day the new trial motion was denied, August 15, 2013.

"A motion for new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). The thirty day period for filing a motion for new trial "is jurisdictional and cannot be expanded." *State v. Hatcher*, 310 S.W.3d 788, 800 (Tenn. 2010). As such, "[a] trial judge does not have jurisdiction to hear and determine the merits of a motion for new trial which has not been timely filed." *State v. Bough*, 152 S.W.3d 453, 460 (Tenn. 2004). Likewise, a notice of appeal must be filed "within [thirty] days after the date of entry of the judgment appealed from." Tenn. R. App. P. 4(a). An untimely motion for new trial will not toll this thirty-day period. *State v. Davis*, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987). While this court may waive the untimely filing of a notice of appeal pursuant to Tennessee Rule of Appellate Procedure 4(a), we do not have the authority to waive the untimely filing of a motion for new trial. *State v. Stephens*, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007).

13

Failure to timely file a motion for new trial causes all issues to be "deemed waived except for sufficiency of [the] evidence and sentencing." *Bough*, 152 S.W.3d at 460. We may review issues normally considered waived pursuant to the plain error doctrine. Tenn. R. App. P. 36(b).

In the case under submission, the trial court reviewed the motion for new trial despite the fact that the trial court did not have jurisdiction to hear and determine the merits of the untimely motion. The trial court's "erroneous consideration [and] ruling on a motion for new trial not timely filed . . . does not validate the motion." *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (citing *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989)).

Because the untimely filing of a motion for new trial does not toll the time for filing a notice of appeal, a late filed motion for new trial will generally result in an untimely notice of appeal. *State v. Patterson*, 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997); *Davis*, 748 S.W.2d at 207. In the case herein, the trial court denied the untimely motion for new trial on August 15, 2013, and Defendant filed an untimely notice of appeal on the same date.

When the motion for a new trial is not timely filed, the appellate court will consider only those issues that would result in the dismissal of the case, including sufficiency of the evidence, or a sentencing issue. Tenn. R. App. P. 3(e); *see also State v. Boxley*, 76 S.W.3d 381 (Tenn. Crim. App .2001); *State v. Timothy Wayne Henderson*, No. 01C01-9801-CC-00001, 1998 WL 731576, at *1 (Tenn. Crim. App., at Nashville, Oct. 21, 1998), *no Tenn. R.App. P. 11 application filed*. There is, however, no automatic appeal of this issue to this Court. Either the timely filing of a notice of appeal must occur, or a waiver of the timely filing of a notice of appeal must be obtained from this Court in order to perfect an appeal. Tenn. R.App. P. 4(a). This Court has commented:

> An attorney who fails to perfect a timely appeal from the entry of a judgment places his client's appeal in peril of dismissal. *See* T[enn]. R. A[pp]. P. 4(a). Although certain post-judgment motions may suspend the time for filing the notice of appeal, none of those motions were timely filed in this case. *See* T[enn]. R. A[pp]. P. 4(c). However, Rule 4(a) provides that the notice of appeal "is not jurisdictional and the filing of such document may be waived in the interest of justice." T[enn]. R. A[pp]. P. 4(a). "In determining whether waiver is appropriate, this Court will consider the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors presented in the particular case.*" State v. Markettus L. Broyld*, No. M2005-00299-CCA-R3-CO, Davidson County, slip op. at 2 (Tenn. Crim. App. Dec. 27, 2005).

14

*State v. Baldomero Galindo*, No. E2009-00549-CCA-R3-CD, 2010 WL 4684469, at *13 (Tenn. Crim. App., at Knoxville, Nov. 19, 2010), *Tenn. R. App. P. 11 application denied* (Tenn. Apr. 13, 2011).

The Defendant in this case challenges the trial court's admission of the victim's preliminary hearing testimony, the trial court's admission of his unsigned statement, the sufficiency of the evidence, and his sentence. The evidentiary issues have been waived by the failure to timely file a motion for new trial, other than our review for plain error. With respect to the other two issues, we elect to waive the timely filing of a notice of appeal.

## B. Plain Error Review

We may review issues normally considered waived pursuant to the plain error doctrine. Tenn. R. App. P. 36(b). The doctrine of plain error only applies when all five of the following factors have been established:

(1) the record clearly establishes what occurred in the trial court;

(2) the error breached a clear and unequivocal rule of law;

(3) the error adversely affected a substantial right of the complaining party;

(4) the error was not waived for tactical reasons; and

(5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). All five factors must be present for plain error review. *See State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000). It is the accused's burden to persuade an appellate court that the trial court committed plain error. *See United States v. Olano*, 507 U.S. 725, 734 (1993). Further, our complete consideration of all five of the factors is not necessary when it is clear from the record that at least one of them cannot be satisfied. *Smith*, 24 S.W.3d at 283.

## 1. Victim's Preliminary Hearing Testimony

The Defendant contends that the admission of the victim's preliminary hearing

15

testimony violated his Sixth Amendment right to confront and cross-examine adverse witnesses. He asserts that the victim's preliminary hearing testimony was "hearsay," falling under the United States Supreme Court ruling in *Crawford v. Washington*, 541 U.S. 36 (2004). The Defendant concedes that the victim was "unavailabl[e]," but he asserts that "as a matter of law and fundamental fairness, the admission of [the victim's] preliminary hearing testimony was error and violated" his constitutional rights.

The Defendant asserts that the victim's testimony did not fall under Tennessee Rule of Evidence 804(b)(1) because there was a substantial difference in the development of the testimony at the preliminary hearing and a trial by jury. He notes that the standard of proof is different because the preliminary hearing is a limited procedure and lacks the finality of a jury trial, and a preliminary hearing may be waived. The Defendant also notes that, prior to the preliminary hearing, the State is not required to share any information that may be discoverable to a defendant at a trial by jury, and the identification standards are more "lax" at the preliminary hearing stage.

The State responds that the Defendant cannot prove that the trial court committed error, much less plain error, when it admitted the preliminary hearing testimony. It asserts that the victim's testimony meets the requirements for admissible testimony from an unavailable witness, as the victim was unavailable due to his death and because the witness was cross-examined at the preliminary hearing.

Our review requires us to examine whether the trial court's admission of the victim's preliminary hearing testimony breached a clear and unequivocal rule of law. *Hatcher*, 310 S.W.3d at 808. Generally, the admissibility of evidence rests within the sound discretion of the trial court, and this court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record. *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010). "A trial court abuses its discretion only when it applies an incorrect legal standard or makes a ruling that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Id.* However, the determination of "[w]hether the admission of hearsay statements violated a defendant's confrontation rights is . . . a pure question of law." *State v. Brian Roberson*, No. E2013-00376-CCA-R3-CD, 2014 WL 1017143, at *6 (Tenn. Crim. App., at Knoxville, Mar. 14, 2014) (quoting *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010)) (footnote omitted). Thus, the proper application of that law to the trial court's factual findings is a question of law and is subject to *de novo* review. *Id.*

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible unless admission is authorized by the evidence rules or by other controlling provisions of law. *Id*. at 802. Tennessee Rules of Evidence 803 and 804

16

list the exceptions to this general rule of inadmissibility. One such exception is for former testimony. Tenn. R. Evid. at 804(b)(1). It provides as follows:

> The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) Former Testimony. Testimony given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination.

Tenn. R. Evid. 804. As relevant to this appeal, the requirements for unavailability are met when a witness "is unable to be present or to testify at the hearing because of the declarant's death or then existing physical or mental illness or infirmity." Tenn. R. Evid. 804(a)(4). "A preliminary hearing transcript is precisely the type of former testimony contemplated under [Rule 804(b)(1)]." *State v. Bowman*, 327 S.W.3d 69, 88-89 (Tenn. Crim. App. 2009) (concluding that the witness's preliminary testimony was "admissible under the 'former testimony' hearsay exception of Rule 804(b)(1) and . . . did not violate the defendant's rights under the Confrontation Clause") (internal quotations omitted).

The Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Tennessee Constitution provides the corresponding right "to meet witnesses face to face." Tenn. Const. art. I, § 9. In order to protect a defendant's right to confrontation, before the prior testimony of a witness will be admitted, the State must show that (1) the witness is unavailable and (2) the defendant had a prior opportunity to cross-examine the witness. *See State v. Maclin*, 183 S.W.3d 335, 351 (Tenn. 2006) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)).

A panel of this court in *State v. Michael James Grubb*, No. E2005-01555-CCA-R3-CD, 2006 WL 1005136 (Tenn. Crim. App., at Knoxville, Apr. 18, 2006), succinctly addressed this issue, reaching the same conclusion as that in *Bowman*:

> The "purpose of a preliminary hearing is . . . to determine whether there exists probable cause to believe that a crime has been committed and that the accused committed the crime." *State v. Lee*, 693 S.W.2d 361, 363 (Tenn. Crim. App. 1985). The difference in the standard of proof not-withstanding, the basic purpose of the preliminary hearing and the trial are not "totally separate" as the Defendant argues, but rather deal with precisely the same

17

issue: whether or not the accused is guilty of the crimes for which he or she is charged. *See State v. Howell*, 868 S.W.2d 23 8, 251 (Tenn. 1993) (holding that a preliminary hearing testimony of a declarant could be introduced at trial under the former testimony exception based primarily on a finding that "at both the [preliminary] hearing and the subsequent trial, the testimony was addressed to the same issue of '[w]hether or not the defendant[ ] had committed the offense' charged."). Accordingly, we conclude that the Defendant in this case had the opportunity to cross-examine Officer Beyer at the preliminary hearing with the same motives that would have guided his cross-examination of the declarant had he been available at trial. *See State v. Brian Eric McGowen*, No. M2004-00109-CCA-R3-CD, 2005 WL 2008183, at *11 (Tenn. Crim. App., Nashville, Aug. 18, 2005) (holding that the trial court did not err in allowing preliminary hearing testimony to be introduced at trial under the former testimony exception because the motive to cross-examine the defendant was the same at both the preliminary hearing and trial). Thus, *Crawford's* cross-examination requirement was met in this case.

*Id.* at *7; *State v. Edward Warren Wise*, No. M2012-02129-CCA-R3-CD, 2013 WL 4007787, at *5-6 (Tenn. Crim. App., at Nashville, Aug. 6, 2013); *see also Roberson*, 2014 WL 1017143, at *6.

As in *Grubbs* and *Bowman*, we also conclude that the Defendant's motive for cross-examining the victim at the preliminary hearing was "similar" to the motive for cross-examining him at trial: to negate the Defendant's culpability for the offense charged. The Defendant's attorney asked the victim questions challenging his sobriety, his vision, his memory, his recollection of the lights being illuminated, among other questions. The victim died of natural causes before the trial. The victim's testimony qualifies as "former testimony" and was admissible under Rule 804(b)(2). The record clearly shows that the victim was "unavailable" at trial, that the Defendant had a similar motive to develop the testimony at the preliminary hearing as he would have had at trial, and that the preliminary hearing cross-examination was sufficient to meet the confrontation requirements of *Crawford*. *See also Wise*, 2013 WL 4007787, at *6 (reaching the same conclusion on similar facts). Therefore, we conclude that the trial court did not violate an unequivocal rule of law when it admitted the victim's testimony from the preliminary hearing, and the Defendant is not entitled to plain error review of this issue.

### 2. The Defendant's Unsigned Statement

We review for plain error the Defendant's contention that the trial court erred when it admitted into evidence an unsigned statement given by the Defendant. The Defendant

asserts that he moved to suppress this statement because it was not signed. The Defendant asserts that his mental state was "poor" because he had been awake for a week without eating or drinking and he was using drugs. The trial court denied his motion to suppress, relying on the fact that the Defendant signed an Advice of Rights Form. He asserts that his statement was not knowingly and voluntarily given. The trial court found that the lack of signature on the statement went to its weight and not its admissibility. The State counters that this issue does not require plain error review because the Defendant voluntarily and knowingly gave this statement as evidenced by the facts that he understood his rights, signed the Advice of Rights form, and was not under the influence of drugs or alcohol.

In determining whether plain error review is warranted, we first turn to address whether the trial court breached a clear and unequivocal rule of law by allowing the statement into evidence. *See Hatcher*, 310 S.W.3d at 808. Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

This Court has upheld the admission of an unsigned statement in situations where the statement was otherwise voluntarily given. *See State v. Bruce C. Reliford*, No. W2007-02899-CCA-R3-CD, 2010 WL 1610517, at *5 (Tenn. Crim. App., at Jackson, April 19, 2010), *perm. app. denied* (Tenn. Sept. 23, 2010); *State v. Gregory Lynn Redden*, No. M2000-009880CCA-R3-CD, 2000 WL 1897141, at *14 (Tenn. Crim. App., at Nashville, Dec. 28, 2000), *perm. app. denied* (Tenn. Apr. 30, 2001). In *Reliford*, this Court stated:

> Next, the defendant argues that the trial court erred in determining that his unsigned statement was admissible. The trial court relied on the decision in *State v. Gregory Lynn Redden*, No. M2000-00988-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 988, 2000 WL 1879141 (Tenn. Crim. App. at Nashville,

Dec. 28, 2000). The defendant in *Redden* also signed an advice of rights form before giving a statement of confession to the crime of which he was ultimately convicted. Redden also refused to sign the statement after it was reduced to writing. *Id.* at \*4. This court held that the defendant's oral confession was just as binding as a written confession in the absence of evidence to show that the statement was not given voluntarily. *Id*. at \*14 (citing *Campbell v. State*, 215 Tenn. 95, 384 S.W.2d 4, 9 (Tenn. 1964)). The lack of a signature on the statement did not affect its admissibility, only the potential weight assigned to the evidence by the jury. *Id.* The trial court properly admitted the unsigned statement.

*Reliford*, 2010 WL 1610517, at \*5. Because the trial court followed the law as stated in *Redden* and *Reliford*, it did not violate a clear and unequivocal rule of law. The Defendant is not entitled to plain error review of this issue.

## C. Sufficiency of Evidence

The Defendant next contends that the evidence is insufficient to sustain his convictions for aggravated robbery, aggravated burglary, and theft of property valued over $1,000. He asserts that the trial court "erroneous[ly]" admitted the victim's preliminary hearing testimony and his unsigned statement and that, absent these pieces of evidence, no rational trier of fact could have found that the Defendant was the perpetrator of the charged offenses. The State counters that the evidence is sufficient to support each of the Defendant's convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of

review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

## 1. Aggravated Robbery

Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear. T.C.A. § 39-13-401 (2014). Aggravated robbery is robbery as defined in § 39-13-402(a):

(1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or

(2) Where the victim suffers serious bodily injury.

T.C.A. § 40-13-402 (2014). As previously discussed, the trial court did not err when it admitted the victim's preliminary hearing testimony and the Defendant's statement. The evidence, viewed in the light most favorable to the State, showed that the Defendant entered the victim's home and forced the naked victim into his bedroom. The Defendant placed the victim in a chair and covered him with a sheet. The Defendant found and picked up a steak knife that the victim had in his bedroom. The Defendant told the victim that he would kill him if he raised the sheet again. The victim described himself as "so scared" and prayed out loud continually. The Defendant took a video camera, money, and other items from the victim's home. He loaded the items into the victim's car, took the victim's keys, and left the home in the victim's car. This evidence is sufficient to support the Defendant's conviction for aggravated robbery.

## 2. Aggravated Burglary

Aggravated burglary occurs when a person enters a habitation with the intent to commit a felony, theft, or assault. T.C.A. § 39-14-402(a)(1), -403(a) (2014). The specific intent required for a burglary may be established by circumstantial evidence. *See Bollin v. State*, 486 S.W.2d 293, 296 (Tenn. Crim. App. 1972). Additionally, when a defendant breaks and enters into a building containing valuable property with the absence of an "acceptable excuse" for doing so, a jury may "reasonably and legitimately infer . . . a defendant intends to commit theft." *State v. Ingram*, 986 S.W.2d 598, 699 (Tenn. Crim. App. 1998) (citing *Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973)).

In this case, the evidence considered in the light most favorable to the State, showed that the Defendant was walking through a neighborhood when he came upon a house that he thought might be empty. He entered the home looking for money or items he could sell to obtain money to use to purchase drugs. The Defendant saw the victim in the home, and forced him to lay down in his bedroom. The Defendant then began looking for items to steal, and he took two wallets, two cell phones, cash, a $700 video camera, and the victim's car. This evidence is sufficient to support the Defendant's conviction for aggravated burglary.

## 3. Theft of Property Valued more than $1,000

The Defendant contends that the evidence is insufficient to sustain his conviction for theft of property valued more than $1,000. The trial judge merged this conviction with the

22

Defendant's conviction for aggravated robbery.

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a) (2014). "'Knowing' means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-106(a)(20) (2014). Theft of property valued at $1,000 or more but less than $10,000 is a Class D felony. T.C.A. § 39-14-105(a)(3) (2014).

The evidence in this case proved that the Defendant entered the victim's home and took items of personal property. He took two wallets, two cell phones, one $700 video camera, an "amp." The Defendant then took the victim's automobile. The jury could have inferred from the evidence that the value of the property taken totaled more than $1,000. This evidence is sufficient to sustain the Defendant's conviction, and he is not entitled to relief on this issue.

### D. Sentencing

Finally, the Defendant contends that the trial court erred when it sentenced him as a multiple offender for his aggravated robbery conviction and a persistent offender for his aggravated burglary conviction. The Defendant concedes that he had the requisite number of felonies to establish these ranges, but he contends that his other convictions were "non-violent and relatively minor." Further, he asserts that the trial court failed to consider his drug use as mitigating evidence. He next contends that the "steak knife" was not a deadly weapon used in the commission of the aggravated burglary. The State counters that the record demonstrates that the Defendant's sentence was supported by the proof and was determined in accordance with the applicable sentencing principles.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2012); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004). As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

23

Appellate review of sentences has been *de novo* with a presumption of correctness. *See* T.C.A. § 40-35-401(d) (2012). In a recent decision, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708; *State v. Caudle*, 338 S.W.3d 273, 278-79 (Tenn. 2012) (explicitly applying the same standard to questions related to probation or any other alternative sentence).

A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708.

The misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Id.* A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id.* at 707. So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate range should be upheld. *Id.*

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210 (2014); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his

24

sentence.  *See* T.C.A. § 40-35-401, *Sentencing Comm'n Cmts*.

We conclude that the trial court properly sentenced the Defendant.  The trial court considered the relevant principles and sentenced the Defendant to a within range sentence. The evidence presented at trial and during the sentencing hearing supports the trial court's application of the relevant enhancement factor.  The trial court did not err when it did not consider the Defendant's drug addiction as a mitigating factor.  Our review of the record reveals that the trial court followed the purposes and principles of the Sentencing Act when it applied a sentence within the appropriate sentencing range.  The Defendant has not carried his burden of showing that the trial court's sentence is improper and, therefore, is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE